RICHARD HONG (N.Y. Attorney Reg. No. 2503589)
Email: HongR@sec.gov
J. LEE BUCK, II (D.C. Bar No. 421878)
Email: BuckJL@sec.gov
ALFRED C. TIERNEY (Cal. Bar No. 274265)
Email: TierneyA@sec.gov
BENJAMIN D. BRUTLAG (N.Y. Attorney Reg. No. 4596698)
Email: BrutlagB@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Melissa R. Hodgman, Associate Director
100 F Street N.E.
Washington, DC 20549
Telephone: (212) 336-0956 (Hong)

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>vs.<br><br>GERARDO DE NICOLÁS GUTIÉRREZ, CARLOS JAVIER MOCTEZUMA VELASCO, RAMÓN LAFARGA BÁTIZ, and NOE CORRALES REYES,<br><br>                    Defendants. | Case No.  17-cv-02086 (JAH) (JLB)<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, United States Securities and Exchange Commission ("SEC" or "Commission"), alleges and states as follows:

# SUMMARY

1.       This is a financial fraud case.  Beginning by 2010 and continuing into May 2016, four senior officers and employees of the homebuilder company Desarrolladora Homex, S.A.B. de C.V. ("Homex" or "the Company") engaged in a multi-billion dollar fraud to create and sustain the illusion that Homex had built and sold tens of thousands of homes annually that, in fact, it had neither built nor sold.  Across Homex's 2010 through 2012 fiscal years alone, the fraud's overstatements totaled at least USD $3.3 billion (MXN $44 billion) in revenue, or 355%, and at least 100,000 in units sold, or 317%.

2.       To create this illusion, Homex's then-Chief Executive Officer ("CEO"), Gerardo de Nicolás ("de Nicolás"), and its then-Chief Financial Officer ("CFO"), Carlos Moctezuma ("Moctezuma"), first approved annual reports submitted to the SEC for Homex's 2010 through 2012 fiscal years that painted a highly productive, financially rosy picture of Homex.  This picture, however, was directly contrary to the markedly unproductive, financially dire picture, detailed below, with which both were contemporaneously familiar.  As the Company subsequently filed for bankruptcy and pursued reorganization, de Nicolás and Moctezuma again incorporated these prior periods' financials into Homex's post-bankruptcy business plan, which was shared, as de Nicolás and Moctezuma knew it would be, with investors.

3.       The fraud was committed through a false second set of books, created by, among others, Noe Corrales ("Corrales"), a then-manager in the Company's operations department, on instructions from the Company's then-Controller, Ramón Lafarga ("Lafarga").  This second set of books was kept in particular portions of Homex's financial databases to which de Nicolás strictly limited access to himself, Moctezuma, Lafarga, and a very small number of their subordinates,

including Corrales.  The particular false entries in this second set of books included (i) manually entered false revenue from tens of thousands of fictitious home sales over multiple years, as well as (ii) corresponding manually entered false cost-of-sales and inventory information.

4.    It was essential to the fraud's continuation and concealment to employ deceptive conduct that could generate cash and, at the same time (i) limit the abnormal growth of the accounts-receivable balance resulting from the fictitious home sales and (ii) create the false appearance of normal operations.  Defendants de Nicolás and Moctezuma engaged in this deceptive conduct by causing Homex to enter into purported non-recourse factoring agreements with at least 13 Mexican banks concerning at least USD $7.5 billion (MXN $97 billion) in Homex's purported accounts receivable.  As de Nicolás and Moctezuma knew, but concealed from and mischaracterized to the Company's investors, these agreements were in reality short-term loans, which Homex was able to repay only by using the proceeds of new, similar agreements.

5.    In addition, de Nicolás made profits and avoided losses from selling Homex securities, including during the first half of 2013, while participating in the financial fraud at the Company.  Moreover, de Nicolás, Moctezuma, Lafarga and Corrales each profited from the fraud, as it facilitated the Company's capital raising, delayed its bankruptcy, and, in the case of de Nicolás, Moctezuma and Corrales, forestalled their terminations.

6.    By engaging in this scheme, de Nicolás, Moctezuma, Lafarga, and Corrales each violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), as well as books and records and internal accounting controls provisions of the Exchange Act.  In addition, de Nicolás, Moctezuma, Lafarga, and Corrales aided

and abetted Homex's violations of the periodic reporting, books and records and internal accounting controls provisions of the Exchange Act; and de Nicolás and Moctezuma also violated the lying-to-auditors and annual report certification provisions of the Exchange Act.

7.      Unless restrained and enjoined by this Court, de Nicolás, Moctezuma, Lafarga, and Corrales will likely continue to engage in this type of violative conduct.  The SEC accordingly seeks (a) injunctions against future violations against all Defendants; (b) disgorgement of ill-gotten gains and statutory money penalties against all Defendants; and (c) officer and director bars against de Nicolás, Moctezuma, and Lafarga.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Securities Act Sections 20(b), 20(d)(1), and 22 [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v] and Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.      Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce or the mails, or a facility of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.      Venue is proper in this District pursuant to Section 22(a) [15 U.S.C. § 77v(a)] of the Securities Act and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Certain of Defendants' acts, practices, and courses of business alleged in this Complaint occurred within this District.

## DEFENDANTS

11.      **Gerardo de Nicolás Gutiérrez**, age 48, is a Mexican citizen residing in Mexico.  He served as Homex's CEO from 1997 through September 30, 2006,

3

and again from July 2007 until May 5, 2016, when he took a leave of absence from his position as CEO.  As discussed below, de Nicolás possessed the power to direct or cause the direction of the management and policies of Homex.  In addition, he controlled the day-to-day affairs of Homex and possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Homex.  He was later terminated by the Company.

12.  **Carlos Javier Moctezuma Velasco**, age 46, is a Mexican citizen residing in Mexico.  He served as Homex's CFO from December 2009 until May 5, 2016, at which time Moctezuma took a leave of absence from his position as CFO.  He was later terminated by the Company.

13.  **Ramón Lafarga Bátiz**, age 57, is a Mexican citizen residing in Mexico.  He served as Homex's Controller and Administrative and Accounting Officer from at least 2009 until he left the Company in April 2014.  Since 1992, Lafarga has been licensed as a public accountant in Mexico.

14.  **Noe Corrales Reyes**, age 47, is a Mexican citizen residing in Mexico.  He served as a manager in Homex's Operations department until he resigned from the company in October 2016.  Corrales holds an inactive license as a public accountant in Mexico.

## FACTUAL ALLEGATIONS

### I.   BACKGROUND

15.  Homex was founded in 1989 in Culiacán, Sinaloa, Mexico, and incorporated in 1998 under the Mexican Companies Law.  Through at least 2013, Homex purported to be the largest real estate development company in Mexico.

16.  Homex was founded by several members of the de Nicolás family, which owned approximately 34% of the Company until significant sales of the family's shareholdings in the first half of 2013 reduced its percentage ownership to

4

approximately 17% by June 2013.  Homex's CEO at all relevant times, de Nicolás, was among the members of that same de Nicolás family.

17.    In May 2016, following Homex's public disclosure of the SEC investigation that has led to the filing of this action, de Nicolás stepped down as CEO and board member, was placed on unpaid administrative leave, and was later terminated from the Company's employ.  Also in May 2016, Homex's CFO at all relevant times, Moctezuma, likewise stepped down from the CFO role, was placed on unpaid administrative leave, and was later terminated from the Company's employ.

18.    Homex's equity securities were dually listed on the New York Stock Exchange ("NYSE") and the Mexican Stock Exchange ("BMV").  Homex offered and sold hundreds of millions of dollars in debt securities, including two $250 million issuances, in 2005 and 2009 (maturing in 2015 and 2019, respectively), and a $400 million bond issuance in February 2012.

19.    In 2013, only one year after its last public debt offering, Homex began defaulting on its debt obligations and repeatedly failed to file timely reports with the Commission.  Homex eventually filed for Mexico's equivalent to bankruptcy reorganization in April 2014.

20.    In June 2014, Homex's American Depositary Shares ("ADSs") were delisted from the NYSE (after being suspended from NYSE trading the previous month), but thereafter continued to be quoted for U.S. trading on the over-the-counter markets.

21.    Homex exited from bankruptcy through a Court Judgment issued on July 3, 2015, and its Reorganization Plan became effective on October 23, 2015.

22.     Upon request by the Company, on December 9, 2016, the American Depositary Receipt facility for Homex's ADSs was terminated.  Homex's ADSs are no longer quoted for U.S. trading on the over-the-counter market.

## II.     RELEVANT ACCOUNTING POLICIES

23.     As Defendants each knew or were reckless in not knowing, for its fiscal years 2010 through 2011, Homex prepared its financial statements in accordance with Mexican Financial Reporting Standards ("MFRS"), and, for its fiscal year 2012, Homex prepared its financial statements in accordance with International Financial Reporting Standards ("IFRS").  For purposes of its 2010 and 2011 annual filings of Forms 20-F with the Commission, as Defendants likewise knew or were reckless in not knowing, Homex reconciled its consolidated reports of net income, including revenues, and its consolidated stockholder's equity to U.S. Generally Accepted Accounting Principles ("U.S. GAAP").

24.     In its annual filings on Form 20-F for the fiscal years 2010, 2011, and 2012, each approved and certified by de Nicolás and Moctezuma (and signed by the latter), Homex stated that revenues from the Company's home sales were recognized only upon the fulfillment of certain conditions, including "control" of the home having been transferred to the homebuyer and it having become probable that the Company will "receive the economic benefits associated with the transaction."

25.     As all Defendants knew, or were reckless in not knowing, at all relevant times, Homex's internal accounting policies and procedures further provided that revenue could be recognized only for homes that attained "Operada" status.  In order to attain this status, various conditions had to be fulfilled, including third-party certification that the home had become habitable (i.e., that the home had been built) and that transfer of title to the buyer had occurred.

26.    Accordingly, under U.S. GAAP, IFRS, and Homex's own disclosures and internal policies and procedures, and as all Defendants knew or were reckless in not knowing, a home had to be substantially constructed before Homex could meet the criteria above and recognize revenue for its sale.

## III.    HOMEX'S INTERNAL SYSTEMS, RECORDKEEPING, FINANCIAL REPORTING PROCESS, AND ACCOUNTING CONTROLS

27.    At all relevant times, and as all Defendants knew or were reckless in not knowing: (i) as part of normal operations, Homex employees entered operational and financial data concerning the construction and sale of homes into an internal system called the "Sistema Integral de Administración" (the "SIA" system); (ii) the SIA system was composed of several modules, *e.g.*, the Operations, Sales, Construction, and Treasury Modules, dedicated to the specific type of data entered therein; (iii) during the course of day-to-day operations, numerous Homex employees across Mexico entered data into SIA's Construction, Sales, and Operations Modules that accurately reflected the true progress of home construction, sales, and revenue collection, respectively; (iv) unlike other modules, which tracked information down to the specific house level, the Treasury Module tracked revenue from home sales only at the project level, *i.e.*, it did not keep data concerning sales of specific homes; and (v) access to SIA's Treasury Module was limited to certain persons in Homex's headquarters, including de Nicolás, Moctezuma, and Lafarga, and a tightly limited number of their subordinates, including Corrales.

28.    At all relevant times, and as all Defendants knew or were reckless in not knowing: (i) for operational purposes, data entered into the SIA system was viewed and analyzed through a proprietary interface called the Sistema de Informacion Gerencial ("SIG"); and (ii) for finance and accounting purposes,

information in the SIA was purportedly automatically exported to the "Contpaq" system, a commercial software system used to process accounting information and consolidate financial statements.

29.     As all Defendants knew or were reckless in not knowing: (i) at the end of a financial reporting period, Homex's financial reporting procedures provided that the financial and accounting information entered and maintained in the SIA system during the reporting period, including home sale revenue information, was automatically exported into Contpaq; and (ii) once exported into Contpaq, that information was then consolidated into financial statements used for financial reporting purposes, including Homex's annual filings with the Commission on Form 20-F.

30.     As all Defendants knew or were reckless in not knowing at all relevant times: (i) de Nicolás maintained and exercised unilateral authority to limit Homex employees' access to information in the SIA and Contpaq systems; (ii) de Nicolás limited almost all employees' access so that they were able to view or enter only information that was directly related to their respective roles within the Company, *e.g.*, employees working on a particular real estate project could enter and view data concerning only that project and were restricted from entering or viewing data from other projects; similarly, employees could access only information concerning their department; and (iii) de Nicolás permitted only himself, Moctezuma, and Lafarga unrestricted access to the information in all of Homex's systems, including the SIA and Contpaq systems.

## IV.     HOMEX'S FRAUDULENT ACCOUNTING SCHEME

### A.     Materially Misstating Revenues Associated With Home Sales

31.     From 2010 through the third quarter of 2013, Defendants knowingly or recklessly engaged in a scheme to materially overstate Homex's revenues,

8

homes sold, and other related financial items.  During fiscal years 2010 through 2012, this scheme overstated the Company's revenue by at least USD $3.3 billion (MXN $44 billion) or 355%, and overstated its number of units sold by over 100,000 units, or 317%, as illustrated by the following chart:

| OVERSTATED REVENUES AND UNITS SOLD FISCAL YEARS 2010-2012 (Revenue Figures in Millions of MXN $) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **FY 2010** | | **FY 2011** | | **FY 2012** | | **TOTAL 2010-2012** | |
| | Revenue | Unit Sales | Revenue | Unit Sales | Revenue | Unit Sales | Revenue | Unit Sales |
| **As Reported on Form 20-F** | $18,465 | 44,347 | $20,210 | 52,486 | $18,809 | 42,945 | $57,484 | 139,778 |
| **Actual Results** | $6,456 | 16,977 | $3,981 | 11,006 | $2,200 | 5,536 | $12,637 | 33,519 |
| **Revenue / Units Overstated** | **$12,009** | **27,370** | **$16,229** | **41,480** | **$16,609** | **37,409** | **$44,847** | **106,259** |
| **% Overstatement** | *186%* | *161%* | *408%* | *377%* | *755%* | *676%* | *355%* | *317%* |

32.   Homex, de Nicolás, and Moctezuma made the aforementioned material misstatements publicly in (i) numerous filings with the Commission identified in Exhibit 1 hereto, each of which de Nicolás and Moctezuma approved, and/or signed, including Homex's annual reports on Form 20-F for fiscal years 2010 through 2012, as well as all of the financial reports Homex furnished on Form 6-K during 2010 through the third quarter of 2013; and (ii) in Homex's public offering documents concerning its February 2012 issuance of $400 million in corporate bonds, which, as de Nicolás and Moctezuma knew or were reckless in not knowing, incorporated the prior year financial statements that Homex had filed with the Commission, including for the fiscal year 2010.

33.   In connection with each of the aforementioned annual reports that Homex filed with the Commission, de Nicolás and Moctezuma each signed certifications indicating that each had reviewed the document, and that the financial statements and other financial information included therein fairly

presented in all material aspects the financial condition, results of operations, and cash flows of Homex.  As discussed below, both de Nicolás and Moctezuma knew or were reckless in not knowing that Homex's publicly filed financial statements fraudulently and materially overstated the company's revenues and that Lafarga and Corrales aided and abetted the making of those misstatements.

**B.    Manually Making Fraudulent Top-Line Revenue and Cost Entries Concerning Fictitious Home Sales**

34.    Lafarga, Corrales, and at least one other Homex employee acting at Lafarga's direction, knowingly or recklessly uploaded false information into the Company's internal reporting and accounting systems in order to carry out the fictitious revenue scheme.  Specifically, contrary to the Company's internal controls, policies, and procedures, in preparing the financial statements, these Homex personnel did not use the information accurately captured within SIA's Construction, Sales, and Operations Modules, which was to be automatically exported to Contpaq.  Rather, Corrales, at the direction of Lafarga manually entered false revenue – including tens of thousands of fictitious home sales over multiple years – into SIA's Treasury Module prior to that information being exported to Contpaq.  Subsequently, the false, inflated revenue data was uploaded into Contpaq for financial reporting purposes.

35.    Corrales, again at the direction of Lafarga, maintained a spreadsheet that tracked the fictitious home sales that had been manually entered into SIA's Treasury Module.  Corrales and others used this spreadsheet, which was maintained outside of Homex's internal systems, to ensure that fictitious revenue from manually entered home sales was not double-booked and the scheme would remain hidden.

36.     In order to conceal the manually-entered fictitious revenues, at least one other Homex employee acting at the direction of Lafarga also manually entered corresponding false cost-of-sales and inventory information into Contpaq. These manual entries were necessary to sustain the fraud because the cost-of-sales information corresponding to the fictitious revenues, likewise being fictitious, was never entered into the SIA system in the normal course of Homex's operations, and, therefore, never exported to Contpaq.

37.     Taken together, (i) the fictitious home sale-filled SIA Treasury Module, (ii) Corrales' spreadsheet tracking the same, and (iii) the corresponding false cost of sales and inventory information manually entered into Contpaq, were key components of Homex's false second set of books.

38.     On June 13, 2013 – only three weeks after Homex filed its annual report on Form 20-F for its 2012 fiscal year – Moctezuma received an email from a subordinate in the financial reporting department attaching a spreadsheet comparing "real" home sales (which the spreadsheet called "unidades realizadas") with "accounting" home sales (which the spreadsheet called "unidades contabilidad") for the Company's ten largest real estate developments by reported revenue.  The spreadsheet reflected that, for each of those top ten projects, the "accounting" home sales were significantly greater than the Company's actual home sales.  According to the spreadsheet, five of the ten projects had, in fact, had no sales at all, yet had "accounting" sales ranging between 345 and 1,655 homes. For all ten projects, the spreadsheet showed the Company had in fact sold just 1,682 homes, from which it had realized revenue totaling just (MXN) $1.19 million, while its "accounting" numbers (10,152 home sales for (MXN) $6.469 million in revenue) were more than five times greater than the Company's actual results for those projects.

11

39.     Corrales, Lafarga, and Moctezuma thus each knew or were reckless in not knowing that Homex had a false second set of books; that this false second set of books contained greatly overstated sales and revenue figures; and that these materially overstated figures were used in Homex's financial reporting.

## C.     Homex Recognized Revenue for Unbuilt Homes

40.     By means of the scheme detailed above, Defendants caused Homex to claim to investors that it had built and sold thousands of homes that, in fact, it had not built.  Homex's Real Estate Project 877 (named "Benevento" and located in the Mexican state of Guanajuato) is illustrative.  During the investigation leading to the filing of this action, Moctezuma identified Benevento to the SEC, in a sworn declaration, as one of the Company's top ten real estate projects by revenue. Moctezuma also attached to that declaration Benevento's project plan (identifying the location, block and lot number of each planned housing unit), and details (by block, lot number, sale price and sale date) of the Benevento sales the Company had included in the financial statements it had filed with the SEC on Form 20-F. These documents reflected that, by December 31, 2011, all of Benevento's planned units had been built and sold, and that Homex had recognized and reported revenue for the same.  Satellite images taken in March 2012, however, reveal that hundreds of those very same Benevento units remained unbuilt.  (*See* Exhibit 2 attached hereto).

## D.     Deceptive Conduct to Generate Cash and Limit Accounts Receivable Under a False Guise of Normal Operations

41.     The fraud could not have continued for as long as it did without deceptive conduct that generated cash, limited the growth of the accounts-receivable balance from the fictitious home sales, and projected the false appearance of normal operations.  Defendants de Nicolás and Moctezuma engaged

in this deceptive conduct by causing Homex to enter into purported non-recourse factoring agreements with at least 13 Mexican banks concerning at least USD $7.5 billion (MXN $97 billion) in Homex's purported accounts receivable.

42.    As de Nicolás and Moctezuma knew or were reckless in not knowing, genuine non-recourse factoring agreements typically function as follows: a business having accounts receivable for which eventual payment is certain, but needing cash more quickly, "factors" those accounts receivable by trading with a third party the business's right to future collection of those receivables in exchange for a discounted, immediate up-front payment.  The agreement's "non-recourse" nature means the business is not obligated to make the third party whole for any uncollected accounts receivable.  For accounting purposes, such non-recourse factoring agreements enable the business to immediately reduce its accounts receivable balance and increase its cash balance, without incurring any additional liabilities or accounts payable.

43.    de Nicolás and Moctezuma signed scores of Homex's purported non-recourse factoring agreements that they knew, or were reckless in not knowing, could only be paid off using proceeds of new "non-recourse factoring" agreements, in check-kiting fashion.  However, they further knew or were reckless in not knowing that the agreements in question were not true non-recourse factoring agreements at all but instead contained a recourse provision requiring Homex to replace (as collateral for its scheduled repayments) any non-performing account receivable with a performing one.

44.    As de Nicolás and Moctezuma further knew or were reckless in not knowing, the factoring agreements' payment schedules well exceeded the substantially shorter timing of payments from the Mexican government-backed mortgage lenders who financed substantial portions – as much as 80% – of

13

Homex's home sales.  These extended payment schedules belied the factoring characterization of the agreements by requiring Homex to finance an unnecessarily lengthy repayment period.

45.     Mischaracterizing the nature of the factoring agreements to auditors and investors served the dual purpose of allowing Homex to reduce material amounts of both liabilities and accounts receivables.  As de Nicolás and Moctezuma knew or were reckless in not knowing, the Company incurred billions of dollars in undisclosed and unaccounted for liabilities in connection with the use of these purported non-recourse factoring agreements into which they caused Homex to enter.  Moreover, during that same period and as both Defendants knew or were reckless in not knowing, the Company used the factoring agreements to improperly reduce material amounts of its then-growing accounts receivable balance.  This practice effectively concealed the fact that the Company's accounts receivable were actually growing at a rate disproportionate with normal operations.

46.     As a result of de Nicolás's and Moctezuma's mischaracterization of the factoring agreements, Homex's Forms 20-F for fiscal years 2010 through 2012 contained no disclosure of any "with-recourse" factoring agreements.  Instead, Homex's Forms 20-F for fiscal years 2010 through 2012 disclosed a total of only two factoring arrangements, both of which were without recourse and therefore lacked any payment or guarantor-like obligation on Homex's part.  Further, de Nicolás and Moctezuma likewise failed to disclose to Homex's outside auditor the existence of any "with-recourse" factoring agreements.  Accordingly, de Nicolás and Moctezuma caused Homex to treat, for accounting purposes, the "with recourse" factoring agreements as though they were "non-recourse", by, among other things, refraining from recording any liabilities or accounts payable related to them.

**E.    Signing and Certifying Forms 20-Fs and 6-Ks, and Endorsing a Bond Circular, Presenting a Financial Picture Directly at Odds With Facts the Defendants Knew**

47.    From 2010 through the third fiscal quarter of 2013, de Nicolás and Moctezuma reviewed and approved on a quarterly basis Homex's financial statements prior to their being filed with the SEC.  Throughout that same period, de Nicolás and Moctezuma both annually certified that, based on their knowledge, Homex's annual reports filed with the Commission on Form 20-F, which both approved and Moctezuma signed, did not contain any material misstatements or omissions.  de Nicolás and Moctezuma also approved, and Moctezuma (as well as Lafarga) signed, quarterly during the relevant period publicly filed earnings releases containing the Company's financial statements furnished to the Commission on Form 6-K.  Additionally, in February 2012, de Nicolás and Moctezuma approved a private bond offering circular that incorporated the prior year financial statements that Homex had filed with the Commission, including for the fiscal year 2010.

48.    As Homex's senior most managers and decision makers having unfettered access to the Company's operational and financial systems, de Nicolás and Moctezuma, as a matter of business practice, regularly monitored, reviewed, and analyzed the Company's accurate operational and financial information and utilized it to make operational and financial decisions.

49.    Both routinely reviewed, for example, "key reports" generated by the Operations, Sales, and Construction Modules in Homex's SIA system.  These reports included detailed information concerning home sales, accounts receivable, revenues, expenses, status of construction, and construction quality.  Both routinely discussed these key reports with members of the "First Circle" – a small group of senior managers who reported directly to de Nicolás – during weekly meetings.  de

15

Nicolás also met monthly or bi-monthly with the Company's head of real estate operations and others to monitor the progress of the Company's real estate development projects, including home sales, deliveries, and mortgage collection data.  In addition, de Nicolás and Moctezuma regularly sent and received, via email, detailed operational information to and from members of the First Circle and others.  Moreover, de Nicolás routinely communicated directly with Homex real estate development project managers throughout Mexico.  In these communications, de Nicolás frequently requested and received detailed daily reports, posed specific detailed follow-up questions, and followed up again on the responses he received.

50.     The information that de Nicolás and Moctezuma received through the aforementioned monitoring, review, meetings, reports, and emails was detailed, frequently focused on specific projects, and concerned the Company's true financial and operational performance in real time.  As de Nicolás and Moctezuma knew or were reckless in not knowing, however, the accurate information starkly contradicted representations contained in the Company's financial statements and SEC filings from 2010 through the third fiscal quarter of 2013, and representations incorporated into the Company's 2012 bond-offering circular.

51.     For example, de Nicolás's email communications with Homex project managers include:

    a) a May 2011 daily report informing de Nicolás that, as of May 3, 2011, in a Homex project that was among the Company's top ten projects by revenue, just 10 homes had been sold since April 1, despite a Company goal of 1,225 home sales in that project during the quarter ending June 30, 2011;

16

b) a June 2011 daily report informing de Nicolás that, as of June 2, 2011, in another Homex project that was among the Company's top ten projects by revenue, only 18 homes had been sold since April 1, despite a Company goal of 100 home sales in that project during the quarter ending June 30, 2011; and

c) de Nicolás's June 2011 "important and urgent" message to the project manager in response to the June 2011 daily report, referencing specific operational metrics, criticizing the manager's performance, and directing the manager to update him every day, including Sundays, regarding the project's sales status.  Ultimately, the Company would recognize revenue for 261 home sales in that project during 2011; yet, as of April 27, 2012, more than 211 of those 261 homes remained unbuilt.

52.     Throughout the relevant period, de Nicolás also regularly sent to, and received from, members of his "First Circle" emails attaching detailed spreadsheets containing accurate information drawn from the Operations, Construction, and Sales Modules of the SIA system for the purpose of comparing the Company's actual performance with the goals that had been set by management.  These communications detailed, among other things, the number of homes sold/still unsold; the construction status of homes as to which construction was underway; the number of homes for which construction had yet to begin; homes sold but not yet delivered; and the number of lots with/without services and utilities. Uniformly, these communications reflected drastic underperformance in comparison to goals set by management for all the Company's projects.

53.     One such email, sent to de Nicolás on November 19, 2011, by a member of his First Circle with the subject (as translated) "Report prepared for the

end of the year," stated that, as of that date – which was just six weeks away from year end – only 23,894 homes had been built and sold Company-wide that year, despite the Company's goal of 50,055 homes being built and sold during 2011.

54.     Despite receiving this email, de Nicolás subsequently approved Homex's annual report for 2011 on Form 20-F, which was filed with the SEC on April 30, 2012, representing that Homex had built and sold 52,486 homes during 2011.  This claim, which could be true only if the Company somehow managed to build and sell approximately 28,592 homes in the final six weeks of 2011, appears in four places in the Form 20-F; for example, in the "Management Discussion and Analysis" section claims that "[t]otal units closed of 52,486 in 2011 represents an 18.4% increase compared to total units closed in 2010 of 44,347…. [and is] primarily due to our strategy of focusing on home prototypes in the affordable entry-level which produce higher revenue and profit margins."  In addition, de Nicolás certified the financial statements included in that same Form 20-F, reflecting the associated revenues.

55.     de Nicolás also closely tracked in real time Homex senior management's efforts to improve the Company's chronic underperformance in relation to goals that senior management had set.  These efforts included the implementation of "juegos," which were games or contests that set certain production goals and deadlines for project managers.  During 2011, for example, de Nicolás received the results of one such "juego," in which management had set a goal for project managers throughout Mexico to build and sell 10,000 homes within approximately a month.  Those results, contemporaneously conveyed to de Nicolás, were that only 3,468 homes were built and sold during the juego, and that *every* project manager had fallen short of his or her goal, many by a substantial margin.

56.     Moctezuma also received detailed spreadsheets during the relevant period containing data drawn from Operations, Construction, and Sales Modules of Homex's SIA system, illustrating the Company's dismal performance in real time. For instance, Moctezuma received an October 25, 2012 email with attachments providing details on the operational and financial performance of several projects in Baja California.  The email included performance information about the "Tijuana Pontevedra Ontiveros" project, which Moctezuma would later falsely certify, during the SEC investigation leading to the filing of this action, to be among the Company's ten largest developments by revenue during fiscal years 2010 through 2012.  The e-mail attachments reflect that, as of October 25, 2012, across all the Baja California projects, only 620 houses had been built and sold in 2012, out of a goal of 3,915 for that year.  The email also reflects that in the Tijuana Pontevedra Ontiveros project specifically, only 11 units had been built and sold in all of 2012 through the date of the email, despite a goal of 200 for that year.

57.     The October 25, 2012 email also reflects Homex's plans to build 200 units in Tijuana Pontrevedra Ontiveros in 2012.  This was inconsistent with documents including a sworn declaration that Moctezuma furnished the SEC during the investigation leading to filing of this action.  Those documents reflect that the Tijuana Pontrevedra Ontiveros project was essentially complete by the end of 2011, with all but two of the project's planned units having already been built and sold, before 2012 even began.

58.     Similarly, on June 13, 2013 – only three weeks after Homex filed its annual report for the 2012 fiscal year, and one month before Moctezuma furnished the sworn declaration and accompanying documents to the SEC – Moctezuma received the email from his subordinate referenced above.  As noted in paragraph 38 above, that email attached a spreadsheet comparing "real" versus "accounting"

unit home sales for Homex's ten largest projects by revenue; these were the same "top ten" projects listed in Moctezuma's subsequent sworn declaration to the SEC referenced above. Despite the vast discrepancies reflected in that spreadsheet and detailed in paragraph 38 above between the actual and the "accounting" numbers for those projects, Moctezuma made no effort to disclose the discrepancies (in his subsequent declaration to the SEC or otherwise) or to correct the Company's false publicly-filed financial statements.

59. In addition, on March 7, 2013, more than two months prior to the filing of Homex's 2012 annual report on Form 20-F, Moctezuma received Google Earth files comprising numerous years of satellite imagery of at least 60 of the Company's projects. As of October 2017, and on information and belief, as of March 2013 as well, those Google Earth files distinctly show each project and clearly depict the construction progress, or lack thereof, for each real estate development, including individual housing units, roads, common areas, lots without homes, and undeveloped land. Numerous of the attached Google Earth files, then (on information and belief) as now, included satellite images captured during the Relevant Period clearly indicating that Homex had constructed far fewer housing units than what the Company had publicly reported in its 2010 and 2011 Form 20-Fs, and what it would go on to report, over Moctezuma's signature, in its 2012 Form 20-F.

60. For example, included in the attachment to the March 7, 2013 email to Moctezuma is a Google Earth file for one of the Company's top ten projects located in Central Mexico (as declared by Moctezuma). As of October 2017, as well as of (on information and belief) March 2013, the Google Earth file for this project includes viewable prior satellite images dated December 21, 2012, January 31, 2013, and February 16, 2013, with each image clearly depicting the progress of

the project.  According to the sworn declaration and accompanying documents Moctezuma provided to the SEC, this particular project had been completely constructed and sold by December 31, 2011.  However, the February 16, 2013 image, which, on information and belief, was viewable in the Google Earth file emailed to Moctezuma on March 7, 2013, shows that only a small portion of the project had been developed even by February 16, 2013, with the location of much of the purportedly long-before built and sold housing appearing to be dirt or undeveloped land.

61.     Despite having this clear and timely bird's-eye view of these markedly underdeveloped real estate developments, Moctezuma, once again, made no effort to disclose the discrepancies or to correct the Company's publicly-filed financial statements.  Nor did Moctezuma endeavor to ensure the Company's not-yet-filed Form 20-F for 2012 reported accurate home sales and revenue figures. Instead, Moctezuma went on to certify the fraudulent financial statements and sign off on the materially overstated homes-built-and-sold figures in the Company's Form 20-F for 2012.

**F.    Making False Annual Report Certifications**

62.     Exchange Act Rule 13a-14, promulgated pursuant to Section 302 of the Sarbanes-Oxley Act, requires CEOs and CFOs each to certify, "based on his or her knowledge" that the issuer's periodic filings contain no material misstatements or omissions and that, among other things, these officers have designed or caused to be designed internal controls providing reasonable assurances that financial reporting is in accordance with GAAP.

63.     Moctezuma and de Nicolás each signed and furnished such certifications for each of Homex's Forms 20-F filed for fiscal years 2010 through 2012.  They signed these filings despite knowing or being reckless in not knowing

21

that the Company's internal controls had been circumvented through the failures, detailed above, to accurately report, among other things, Homex's home sales and revenues.

### G.   Lying to Auditors

64.    In connection with the annual audits of Homex's financial statements included in the Company's Forms 20-F for each of fiscal years 2010 through 2012, de Nicolás and Moctezuma signed and furnished to Homex's auditor a management letter making representations to the auditor concerning Homex's financial statements and internal controls over financial reporting (hereinafter "Management Rep Letters").

65.    Each of these Management Rep Letters, as de Nicolás and Moctezuma each knew or were reckless in not knowing at the time each signed them, were false, in that they each asserted, among other things, that "there are no transactions of a material nature, individually or in the aggregate, that have not been properly recorded in the accounting records underlying [Homex's] consolidated financial statements."

### H.   Failing to Correct Homex's False Financials Throughout the Entirety of Their Tenures and Re-using Those Financials in the Company's Bankruptcy Reorganization

66.    Under Exchange Act Rule 10b-5, persons who "make" a statement (as de Nicolás and Moctezuma did with respect to every Homex annual and quarterly report they signed or certified) have an ongoing duty to correct "any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."  Exchange Act Rule 12b-20 confers the same duty on issuers like Homex.

67.    Despite the ongoing nature of this duty to correct, and despite being aware contemporaneously of facts and information, detailed above, that were at

drastic variance from that contained in Homex's annual and quarterly reports, neither de Nicolás, nor Moctezuma, at any time through the very end of their tenures as Homex's CEO and CFO, respectively, in May 2016, caused Homex to correct, restate, or even disclose any concerns as to the reliability of the Company's financial statements or related representations included in its SEC filings.

68.     But de Nicolás and Moctezuma did not merely fail to correct the material misstatements in Homex's 2010 – 2012 financials that each knew or were reckless in not knowing were materially misleading.  As explained below, both compounded this error by affirmatively participating in the re-use of those very financials during Homex's bankruptcy process.

69.     As de Nicolás and Moctezuma knew or were reckless in not knowing, a key aspect of Homex's restructuring strategy through its bankruptcy process in Mexico was the creation by Homex, of a detailed financial model based upon historical Homex revenue, cost, and sales data.  This model played a central role in the Company's Business Plan for post-bankruptcy operations.  Homex made the Business Plan publicly available during the bankruptcy process, and Homex's potential investors and creditors, including those that converted their debt to equity following Homex's emergence from bankruptcy in October 2015, relied upon that Business Plan when making their investment decisions.

70.     Despite the fact that de Nicolás and Moctezuma, as discussed above, each knew or was reckless in not knowing the materially misleading nature of the historical revenue, cost, and sales data contained in Homex's financial statements for its 2010 through 2012 fiscal years, neither disclosed this (or the existence of the SEC investigation that led to the filing of this action) to the Homex advisors who were creating the Company's financial model.  Both were copied on e-mails transmitting this same misleading historical financial information for integration

into financial models for use in the Company's restructuring efforts and disclosures to investors.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### [Securities Fraud]

### Violations of Securities Act Section 17(a)
### [Against All Defendants]

71.     Paragraphs 1 through 70 are realleged and incorporated herein by reference.

72.     As described above, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales, acting knowingly, recklessly or negligently, in the offer or sale of Homex securities, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of Homex securities.

73.     By engaging in the foregoing conduct, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM
## [Securities Fraud]

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### [Against All Defendants]

74.     Paragraphs 1 through 70 are realleged and incorporated herein by reference.

75.     As described above, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of Homex securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

76.     By engaging in the foregoing conduct, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
## [Falsification of Books and Records and Circumvention of Internal Controls]

### Violation of Exchange Act Section 13(b)(5) and Rule 13b2-1
### [Against All Defendants]

77.     Paragraphs 1 through 70 are realleged and incorporated herein by reference.

78.     As described above, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales knowingly circumvented or knowingly failed to implement a system of

25

internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records, or accounts described in Section 13(b)(2) of the Exchange Act.

79.     By engaging in the foregoing conduct, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

# FOURTH CLAIM
### [Misleading an Accountant or Auditor]

## Violations of Exchange Act Rule 13b2-2
### [Against de Nicolás and Moctezuma]

80.     Paragraphs 1 through 70 are realleged and incorporated herein by reference.

81.     As described above, Defendants de Nicolás and Moctezuma, directly or indirectly, and in connection with audits or examinations of the financial statements of Homex and the preparation and filing of statements and reports required to be filed with the Commission, made or caused to be made materially false or misleading statements to accountants and omitted to state, or caused another person to omit to state to accountants, material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading.

82.     By engaging in the foregoing conduct, Defendants de Nicolás and Moctezuma violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## FIFTH CLAIM
### [Making False Annual Report Certifications]

### Violations of Exchange Act Rule 13a-14
### [Against de Nicolás and Moctezuma]

83.     Paragraphs 1 through 70 are realleged and incorporated herein by reference.

84.     As described above, Defendants de Nicolás and Moctezuma, falsely stated in certifications each submitted with Homex's annual reports on Form 20-F for its 2010 through 2012 fiscal years, that, among other things, the financial statements and other financial information included in said annual reports fairly presented in all material aspects the financial condition, results of operations and cash flows of Homex.

85.     By engaging in the foregoing conduct, Defendants de Nicolás and Moctezuma violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## SIXTH CLAIM
### [False and Misleading Annual and Quarterly Reports]

### Aiding and Abetting Homex's Violations of Exchange Act Section 13(a)
### and Rules 12b-20, 13a-1 and 13a-13 thereunder
### [Against All Defendants]

86.     Paragraphs 1 through 85 are realleged and incorporated herein by reference.

87.     Homex, by virtue of the conduct alleged herein by Defendants, violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-16 thereunder, by filing with the Commission materially false and misleading annual reports on Form 20-F for its 2010 through 2012 fiscal years, and materially false

and misleading quarterly reports on Form 6-K for all of its fiscal quarters from its first fiscal quarter of 2010 through its third fiscal quarter of 2013.

88.     By engaging in the foregoing conduct, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales knowingly provided substantial assistance to Homex's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a.16] and, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], thereby aided and abetted those violations.

## SEVENTH CLAIM
### [Falsification of Books and Records]

### Aiding and Abetting Homex's Violations of Exchange Act Sections 13(b)(2)(A) and (B) [Against All Defendants]

89.     Paragraphs 1 through 85 are realleged and incorporated herein by reference.

90.     Homex, by virtue of the conduct alleged herein by Defendants, violated Section 13(b)(2)(A) of the Exchange Act by failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and the disposition of its assets.

91.     In addition, by virtue of the conduct alleged herein by Defendants, Homex violated Section 13(b)(2)(B) of the Exchange Act by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Homex's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with GAAP.

92.     By engaging in the foregoing conduct, Defendants de Nicolás, Moctezuma, Lafarga, and Corrales knowingly provided substantial assistance to Homex's violations of Exchange Act Sections 13(b)(2)(A) and (B)  [15 U.S.C. §§ 78m(b)(2)(A) and (B)] and, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], thereby aided and abetted those violations.

## EIGHTH CLAIM
### [Control Personal Liability]

**Control Person Liability for Homex's Violations of Securities Act Section 17(a) and Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 10b-5, 12b-20, 13a-1, and 13a-16 thereunder
[Against de Nicolás]**

93.     Paragraphs 1 through 85 are realleged and incorporated herein by reference.

94.     Homex violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78m(b)(2)(A) and (B)], and Exchange Act Rules 10b-5, 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.10b-5, 12b-20, 13a-1 and 13a-16] thereunder.

95.     During the relevant period, Defendant de Nicolás was the CEO of Homex and possessed the power to direct or cause the direction of the management and policies of Homex.  Defendant de Nicolás controlled the day-to-day affairs of Homex and possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Homex.

96.     Defendant de Nicolás is a "control person" of Homex pursuant to Section 20(a) of the Exchange Act. [15 U.S.C. §78t(a)].

97.     As Homex's control person, Defendant de Nicolás is liable for Homex's violations of Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Exchange Act Rules 10b-5, 12b-20, 13a-1, and 13a-16.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment that:

(i)     permanently enjoins Defendants de Nicolás, Moctezuma, Lafarga, and Corrales from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5  and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1];

(ii)    permanently enjoins Defendants de Nicolás and Moctezuma from violating Exchange Act Rules 13b2-2 and 13a-14 [17 C.F.R. §§ 240.13b2-2 and 240.131-14)];

(iii)   permanently enjoins Defendants de Nicolás, Moctezuma, Lafarga, and Corrales from aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78(m)(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-16];

(iv)    permanently enjoin Defendant de Nicolás from acting as a "controlling person" within the meaning of Section 20(a) of the Exchange Act in connection with violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78m(b)(2)(A) and (B)], and Exchange Act

Rules 10b-5, 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.10b-5, 12b-20, 13a-1 and 13a-16];

(v)    bars Defendants de Nicolás, Moctezuma, and Lafarga from acting as an officer or director of any public company pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

(vi)    orders Defendants de Nicolás, Moctezuma, Lafarga, and Corrales to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] for all violative conduct occurring within five years of the filing of this Complaint;

(vii)    orders Defendants de Nicolás, Moctezuma, Lafarga, and Corrales to disgorge, with prejudgment interest, any and all ill-gotten gains each received as a result of the conduct described herein within five years of the filing of this Complaint; and

(viii)  grants such other relief as the Court deems just or appropriate.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a trial by jury in this action of all issues so triable.

Dated:  October 26, 2017

Respectfully submitted,

/s/ *Richard Hong*_____
RICHARD HONG
Attorney for Plaintiff
Securities and Exchange Commission

31

# EXHIBIT 1

| Document | Date Filed | Authorization | Signatory | SOX 302 Certification Signatory |
|---|---|---|---|---|
| 2010 Annual Report on Form 20-F/A | 10/11/2011 | de Nicolás, Moctezuma | Moctezuma | de Nicolás, Moctezuma |
| Q1 2010 Earnings Release Furnished on Form 6-K | 4/27/2010 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q2 2010 Earnings Release Furnished on Form 6-K | 7/27/2010 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q3 2010 Earnings Release Furnished on Form 6-K | 10/26/2010 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q4 2010 Earnings Release Furnished on Form 6-K | 3/1/2011 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q1 2011 Earnings Release Furnished on Form 6-K | 5/3/2011 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q2 2011 Earnings Release Furnished on Form 6-K | 7/27/2011 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q3 2011 Earnings Release Furnished on Form 6-K | 10/25/2011 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| 2012 $400 Million Bond Offering Circular | 2/7/2012 | de Nicolás, Moctezuma | n/a | n/a |
| Q4 2011 Earnings Release Furnished on Form 6-K | 2/28/2012 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| 2011 Annual Report on Form 20-F | 4/30/2012 | de Nicolás, Moctezuma | Moctezuma | de Nicolás, Moctezuma |
| Q1 2012 Earnings Release Furnished on Form 6-K | 5/3/2012 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q2 2012 Earnings Release Furnished on Form 6-K | 7/25/2012 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q3 2012 Earnings Release Furnished on Form 6-K | 10/24/2012 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q4 2012 Earnings Release Furnished on Form 6-K | 2/27/2013 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q1 2013 Earnings Release Furnished on Form 6-K | 4/26/2013 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| 2012 Annual Report on Form 20-F | 5/22/2013 | de Nicolás, Moctezuma | Moctezuma | de Nicolás, Moctezuma |
| Q2 2013 Earnings Release Furnished on Form 6-K | 7/26/2013 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |
| Q3 2013 Earnings Release Furnished on Form 6-K | 11/12/2013 | de Nicolás, Moctezuma | Moctezuma, Lafarga | n/a |

# EXHIBIT 2



*Fig. 1:* Benevento Project Plan

*Fig. 2*: March 12, 2012, Benevento satellite image

*Fig. 3:* Colored highlighting reflects Benevento housing units which Homex claimed to have built and sold, and for which it had recorded sales and reported revenue in 2009 (pink), 2010 (green), and 2011 (blue).